NEWMAN, Circuit Judge,
dissenting.
This case is a compelling illustration of why appellate tribunals should give due weight to the attributes and benefits of the processes of trial, for such processes enable the trial judge to dig deeply into the events, to figure out what happened and what was intended, and to reach a just result. This is no less important in contract cases than in any other area of law, and no less important when the government is a party, for today government business affects a significant portion of the nation’s commerce.
The case at bar concerns a contract for the construction of a building on the campus of the National Institutes of Health (NIH), for which the government retained the Bell BCI Company, an experienced contractor. The building contains office and laboratory space for many special purposes, including culture rooms, isotope labs, cold rooms, warm rooms, darkrooms, and other individual requirements of the scientist occupants. The issues in dispute arose because a large number of modifications in the building design continued to be made while the construction was proceeding, sometimes requiring demolition of completed work.
Despite the disruptions that are the subject of this litigation, the government’s Office of Research Facilities Development and Operations described the building as “a shining star on the NIH campus as it represents the latest in laboratory planning and engineering, and has been highly recognized for its energy saving features.” The government’s Project Officer Mr. Frank Kutlak testified at trial that the finished product is “the most outstanding building on the NIH campus,” an “excellent building” and “quite an accomplishment for everybody involved.” Tr. 1229:16-18; 1230:4. But the path to that result was rocky, due to the addition of an entire floor after construction was underway, and an unusual number of design changes throughout the construction.
Witnesses explained at trial that the cumulative effect of the design changes grew as the number of changes grew, including many modifications and Extra Work Orders after it was understood that there would be no further changes. The Court of Federal Claims received extensive testimony about how this contract was implemented by the government and by Bell, and the burgeoning degrees of disruption caused by the government’s continuing changes, accompanied by inflexible deadlines and government pressures for progressive occupancy of the building while under construction. The claims here at issue relate solely to the costs due to the cumulative impact of the extensive changes and ensuing difficulties and delays.
*1344 My colleagues on this panel, ignoring the trial court’s unchallenged findings of contractual intent and mutual understanding as modifications were agreed, make their own findings and hold that “the release language present in Mod 93 and later modifications excuses the government from liability for Bell’s delay claims.” However, Mod 93 was followed by 279 additional Extra Work Orders and 113 additional formal Modifications. The Court of Federal Claims found that the parties intended that the releases pertained to the specific modifications, but did not release all possible liability due to the cumulative impact of subsequent changes. From this court’s reversal of the trial court’s ruling, I respectfully dissent.
DISCUSSION
The Court of Federal Claims found, after a six-day trial with fact and expert witnesses on each side, that the many changes during the construction had a cumulative impact of disruption, delay, and labor inefficiency. These findings have not been challenged. The court found that the government did not prove its defense of accord and satisfaction, and indeed that the government “did not offer any testimony at trial in support of its accord and satisfaction defense.” Bell v. United States, 81 Fed.Cl. 617, 639 (2008). The trial court found that the parties did not intend to release all possible future claims for cumulative impact of the many changes, finding that there was no discussion or expectation that such future claims might arise. My colleagues do not assign error to these findings; they simply ignore them.
The release terms on which my colleagues rely are in paragraphs 4 and 8 of Mod 93:
4. Increase the contract amount by $2,296,963 ($4,100,000-$1,803,037 from Mod 77) as full and equitable adjustment for the remaining direct and indirect costs of the Floor 4 Fit-out (EWO 240-Rl) and full and equitable adjustment for all delays resulting from any and all Government changes transmitted to the Contractor on or before August 31, 2000. 8. The modification agreed to herein is a fair and equitable adjustment for the Contractor’s direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and contract time. The Contractor hereby releases the Government from any and all liability under the Contract for further equitable adjustment attributable to the Modification.
My colleagues, disagreeing with the trial judge, hold that the release provision in Mod 93 is “unambiguous,” and fault the Court of Federal Claims for its recourse to evidence of contractual intent and concerning the meaning of “attributable to the Modification” in paragraph 8. However, the evidence was undisputed, and is indisputably contrary to my colleagues’ findings.
Mod 93 was executed on October 2, 2000. On October 9, 2000 the government’s Project Officer Mr. Kutlak, and Mr. Brian Temme of the firm that had been retained by the government as construction quality manager, wrote jointly to NIH’s architectural design contractor HLM Design that Mod 93 “does not incorporate changes after August 31, 2000, and it is therefore incumbent on the Government’s team to minimize change.” Mr. Temme testified: “Frank [Kutlak] had said something [to Bell] to the effect that there will only be a few more changes,” and that he told Bell “on behalf of Jacobs and the government ... it is incumbent on the government to stop making changes to Bell’s contract.”
Mr. Kutlak testified: “We had discussions that we basically said we would try our best to limit the changes,” and ‘We *1345 had said previously we were going to limit the changes.” Mr. Temme testified that he was “concerned that changes issued after August 31, 2000, would impact those interim milestone dates set forth in Mod 93.” Both witnesses testified that they were concerned with the many and continuing changes to the building construction and the resulting impact on Bell’s mandated interim and final deadlines. They wrote to HLM Design on Oct. 9, 2000:
Since we are pushing Bell to maintain schedules, there can be no more changes. [Mr. Kutlak] urged managers to discourage changes within their sections ... [and Mr. Kutlak] noted the continuing concern about change orders. At this late date in the construction, NIH has little leverage on the contractor to get them done inexpensively and timely.
The requests for restraint were conspicuously ignored throughout the project. As the report by the Office of Research Facilities Development Operations, Division of Property Management stated, there were many “major, wholesale changes which could not be accommodated so late in design.” A Report on the Resolution of Operational Issues and Lessons Learned 14 (Jul.2004).
This Report, which documents extensive “lessons learned”, is consistent with the trial court’s findings. The trial court found that Mod 93 was intended to end the period of work changes, for construction was well underway, yet thereafter “there were 279 Extra Work Orders and 113 contract Modifications issued after August 30, 2000, while NIH project personnel were maintaining that no further changes would be issued.” Bell, 81 Fed.Cl. at 638. Of the 279 Extra Work Orders, 216 were included in the 113 further Modifications; the government refused to pay for the other 58 Extra Work Orders, although Bell had done the requested work. About 47 of the Modifications included' the same release language as in Mod 93; thereafter Bell expressly reserved rights for compensation for additional costs and delay when, as the trial court found, it became apparent that the government had “lost control” of the project. Bell, 81 Fed.Cl. at 619.
Bell’s witness Mr. Jeremy Bardin testified that release from a possible claim for cumulative impact “was never known or even considered at the time” of contracting or at the time of entering into Mod 93, which was directed to building the additional floor. He testified that the language in Mod 93 says “Just what it says: Attributed to the impact of the change orders in that modification, which would be the direct cost of work, the cost of materials, subcontract cost, cost of their G & A.” Tr. 488: 5-8, 11-12. The Court of Federal Claims found Bell’s witnesses credible, and found that the parties did not foresee and did not bargain to release all future possible cumulative impact claims that might arise if many more changes were required. The trial court found that it is undisputed that “[m]any of the events relevant to the cumulative impact claim did not even arise until after the parties signed Modification 093.” Bell, 81 Fed.Cl. at 639. Nor was it disputed that the phrase “further equitable adjustment attributable to the Modification” in paragraph 8 related to the work that was the subject of Mod 93.
The government offered no opposing evidence, and did not call the Contracting Officer, although she was on the witness list. The government did not dispute Bell’s testimony that there was no discussion about releasing future claims based on unforeseen and changed circumstances. Nonetheless, the panel majority holds that the release provision in Mod 93 was an accord and satisfaction covering not only the performance of Mod 93, but the accumulated effect of all future modifications.
*1346 This release clause did not produce an “accord and satisfaction” of unforeseen claims arising from unforeseen and unintended events. The releases are all in terms of “further equitable adjustment attributable to the Modification” in which the releases appear, and do not extend to future modifications and future Extra Work Orders. An accord does not arise until there is a dispute. See Acret, Construction Litigation Handbook 2d § 23:2 (“To constitute an accord, a compromise must be definite and certain.”); Williston on Contracts § 73:27 (“The doctrine of accord and satisfaction provides a method of discharging a contract or cause of action by which the parties may first agree to give and accept something other than that which is due in settlement of the claim or demand of one party against the other, and then perform their agreement^]”). “A condition precedent to a valid accord and satisfaction is the establishment of a bona fide dispute over liability,” Fleming v. Post, 146 F.2d 441, 443 (2d Cir.1944), and requires a meeting of the minds as to what is being satisfied. S & T Mfg. Co. v. Hillsborough County, Fla., 815 F.2d 676, 678 (Fed.Cir.1987).
Contractual intent is a question of fact. Dureiko v. United States, 209 F.3d 1345, 1356-57 (Fed.Cir.2000). No clear error has been suggested in the trial court’s finding that it is undisputed that “[m]any of the events relevant to the cumulative impact claim did not even arise until after the parties signed Modification 093,” Bell, 81 Fed.Cl. at 639, and the conclusion that the parties did not contemplate and did not release the cumulative impact and inefficiency claims that arose after many additional construction modifications. The rules of contract interpretation fully support the trial court’s recourse to contractual intent.
Bell testified that the cumulative impact and inefficiency problems did not arise right away, but burgeoned as changes continued to be required. Contractual intent is viewed in the situation that existed at the time of contracting. The trial court did not err in holding that the release terms in Mod 93 did not bar compensation for future events, for it is not disputed that Bell was told that no more than 4-6 Extra Work Orders should be expected, and that the 279 Extra Work Orders caused cumulative disruption, delay, and inefficiencies. The principles that underlie government contracting preclude the government from taking unfair advantage of changed circumstances during performance. Federal Acquisition Regulation 52.243-4 was incorporated into the basic contract between Bell BCI and the government:
If any change under this clause causes an increase or decrease in the Contractor’s cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.
48 C.F.R. § 52.243-4.
My colleagues, finding no error in the trial court’s understanding of this contract, instead create a speculative theory that no party argued. Their theory of possible compensation for some later changes was not presented by either party, either at trial or on this appeal, and is of questionable validity, for cumulative impact requires recourse to the contributions that accumulated.
The findings and rulings of the Court of Federal Claims are fully supported by the evidence and the law, and should be affirmed.